Good morning, Michael Morgus for Appellant, and may it please the Court. The first thing I want to do is just update the Court on my client's status. He has since been medically retired from the Department. I don't know how much that really affects his case because his claim is that he – that the Department, in retaliation for his First Amendment activities, failed to promote him to sergeant, and that would have impacted his retirement, his pension. So I think he still has some claim there. Do we yet know what Mr. O'Connor said at the Association meeting for which he claims retaliation? I figured that that was going to be the issue here today. Yeah. I mean, you amended your complaint. You have a Third Amendment complaint. We don't yet know that, do we? Well, I don't know that the specific words. We have to know whether it's on a matter of public concern or not. Right. So we need to know what he said. Well, here are the allegations that we do have in the complaint. No, you're not answering my question. What did he say? Okay. For instance, regarding the refusal to vote on the MOU, which is discussed in the complaint, and which I think is the biggest. Whose refusal to vote on the MOU? If you recall in the complaint in paragraphs 38 and 39 of the complaint, Bressler and Perry. Perry is a sergeant. Bressler eventually becomes a commander, and that's the allegation in the complaint. They drafted a memorandum of understanding, a proposed memorandum of understanding, as members of the Association. They bring it to the Association and say, you guys need to vote on this. And the Association won't vote on it. But that has to do with the city if the Association doesn't vote on an MOU. It's because my client is the one that said, we're not going to, we need to look at this. We're not going to vote on this right here and now just because you called a meeting. And in the next paragraph, even within the same paragraph, even though it doesn't say that he's the one that said that, it says that he was the one that was berated by Bressler. Why doesn't he allege what he said? I mean, your complaint is about retaliation because he spoke out on a matter of public concern. So why doesn't your complaint allege what he spoke out about? I agree that the complaint could be better drafted. It could be more specific. Yes, I understand that. I'm stuck with what's in front of me. Are you the lawyer who drafted the complaint? No, I'm not. You're a new lawyer. That's my, the one thing I get to say as the appellate lawyer. It wasn't me. I really don't want to say that. But you're stuck with what your predecessor did. Right, and that's what I tell my client. Well, how would, okay, if we were to give you a chance to amend this complaint, what would you say he said? That he said, we are not going to vote on this MOU just because you have called this meeting, Bressler and Terry, who at the time were members of the association, that you drafted, you love the chief, we want to look at this first. It sounds like an internal union fight. Well, I don't, but that may be an internal union fight. But it gets carried quite beyond that because it's communicated to the chief that he's the one that stands in the way of this thing just sailing through the association. That might be persuasive if it were alleged. Right. And if the plaintiff is given a chance to amend the complaint. Will the same lawyer be drafting it? If you want, I'll draft it. I'll be happy to draft it. You know what, I would make sure that it is drafted to meet Iqbal. Well, you can only draft what your client wants. Absolutely. And I had an extensive, I didn't expect to talk about this today. You don't want to reveal attorney-client communications today. Right, but I did have an extensive discussion with my client last night. And I'm assuming that the other lawyer that four times drafted what his client told him happened. You know what, I can't tell you what the strategy was in trying, perhaps, I mean, it looks like maybe they were trying to be vague or trying to save something. But when you look at the complaint as a whole, the allegations are O'Connor, the appellant in this matter, led the association, that's in paragraph 26, in the meet and confer discussions. He was the focal point for the city through the chief, through Bressler, through Singer. Okay, so you're trying to bring this under the Ellens, Dahlia kind of whole line of thing. And it can't be internal personnel grievances that to state, you can't allege that to state a client. But these are, I'm not alleging that these are internal grievances. So you're going to, so if you were allowed to amend the complaint in light of this new authority, Ellens and Dahlia, you would be claiming that something that affected the public, that some kind of mismanagement that affected the public. Yes. And getting down to part of the heart of this lawsuit is, and yes, it could be drafted much more clear, but I think the key allegations are in paragraphs 38 and 39. These fairly high-ranking officials within the department, who at the time were members of the association, try to get, they draft an MOU, a memorandum of understanding. That is not just an internal complaint. That's the agreement with the entire association that has to be approved by the city council at an agendized meeting. The public is certainly concerned with the salary and benefits. I mean, you just have to read the newspaper to see that pension reform is a huge deal to the public. And that's part of what's in an MOU. Those are pretty much internal working conditions, though, unless there's some allegation of corruption or bad faith dealing. Well, the allegation, I'm sorry to interrupt. No, go ahead. The allegation of bad faith dealing would be these two officers, Perry and Bressler, that drafted this MOU and called this meeting of the association to try to get this thing passed through, are doing it because they want to curry favor with the chief. They are eventually promoted. Bressler is now a commander, or at least at the time of this complaint. So the chief gets upset with my client because he puts his hand up and says, wait a second, we want to look at this. Now, I understand you're saying that it's internal, and that's as far as it got at that point. But when the chief is pushing two officers to get through an MOU that is favorable to management, I think there's some element of it may not be outright corruption, but it's a failure to deal in good faith. Either corruption or detrimental to the public purse is what you're saying. Yes. Yes. And to the officers. Kind of like the city of, what's the city, Bell? Well, no, no, Bell. But Bell was on, obviously, a much grander scale, and the council persons. Right, but that's the kind of thing you're alleging? That those in charge would benefit from an MOU that was detrimental to the police officers. But see, if it's detrimental to the police officers, that's an internal matter. That's collective bargaining. But I don't believe that the California legislature views it so narrowly. For instance, Government Code Section 3300 is the California Public Safety Officers Procedural Bill of Rights Act, which says labor relations between police officers and management is a matter of statewide concern. Then you have Government Code Section 3500, the Myers-Millis-Brown Act, which is the statutory scheme under which these MOUs are supposed to be arrived at and agreed to. And it also says that labor relations is a matter of statewide concern. The MMBA overrides the home rule in California. So these are the working conditions of public employees, not one public employee, but public employees as a whole, is a matter of public concern, at least to the local constituents. And it goes beyond just the individual officers. It's hard for me to conceptualize what you're talking about without specifics, and I think that's the problem with the complaint. And conceptualize any situation where the terms of an MOU and how that might affect the relationship between peace officers and their employer might be of public concern? But Iqbal doesn't allow you to speculate and twamble. There have to be specific allegations that plead a plausible claim. And so speculation doesn't get you there. Well, I can give you some examples. Obviously, in retaliation cases, there's always a degree of circumstance. You know, no one's going to admit we retaliated because of this. Right. That's right. And so there's circumstantial allegations. And I think the public concern prong, the most that it could ever be alleged without taking the deposition of members of the public, is public's concerned about how much the public employees in their local area are being paid and the benefits. And I don't think it's speculation to say that that's an issue. As I mentioned, the pension reform and what you read in the paper about CalPERS and how much public employees are getting, and boy, they sure have it great. I mean, that's not speculation. I don't know, does that mean I have to allege in the complaint that there have been articles showing that the public is concerned with pension? I mean, that's a question of law, isn't it, public concern? Well, you haven't read something about what he said that was specifically related to a matter of public concern rather than generalities, and we don't have that here. In Ellen's, for instance, we had specific criticisms that were made of the police. Well, you had a vote of no confidence. Right, uh-huh, and specific criticisms of the police chief regarding staffing and regarding the priorities that caused, so there was something concrete that the chief was being criticized. That actually brings me to my discussion last night again with my client and Judge Wardlaw asking me what could I possibly allege, and I don't know if this would violate attorney-client privilege, but it's something that I would allege if I were given an opportunity. If you're going to allege it, then it would be public. So this is my proffer of allegations. For instance, there's a discussion in the allegations about safety. My client brought to the chief's attention and criticized the chief for staffing levels. The city of Desert Hot Springs does not have a lot of police officers, and these guys were working, these men and women were working five 12-hour shifts, would have a day off and come back and do six 12-hour shifts, and these guys were falling asleep at the wheel in their cars. So you're saying it's a matter of public safety? Yes, yes, and public safety is mentioned in the allegations. It's just not, the allegations are not specific enough to, were not specific enough to anybody's liking, really. So your proffer would be that these matters were brought to the attention of administration by your client, and he was retaliated after those matters were brought to the attention of policymakers? Yes, and retaliated for his outspokenness in that regard, in regard with the proposed MOU. There's an allegation in the complaint that he was, he was told, you know, your outspokenness is a problem. He was told that by Sergeant Paez, and that's also in the complaint. So maybe we don't have every little detail, but the allegations put together as a whole do paint a picture of a police officer who pretty much led the union. Even if he was the vice president, this is a small department, so those lines are kind of blurred. President, vice president, these are still outspoken members. I mean, this is an LAPD. And that he was retaliated against, that the chief was upset with him, that he was the focal point of that discontent. We also have a case that seems to say if you complain up through the line of authority, that you're not speaking as a private citizen. Do you think that you'd be able to plead to satisfy that requirement as well? Yes, because I don't think that the, this is, I'm not sure if you're talking about Dahlia, but this is not him complaining just to his superiors at the chain of command. We don't like what's going on. This is in his capacity as a union official, and the union operates, naturally operates in tension with the department. And just speaking out on behalf of the membership, not filing a grievance at the chain of command, and not reporting to your supervisor like Dahlia talks about. To back up, do you think that the trial judge abused his discretion in dismissing the third amended complaint after he did an order before that saying plaintiff must allege specific facts regarding the content form and context of the speech at issue, and then the judge concluded that that hadn't been done? Abuse of discretion is the most deferential standard of review. Yes, this is the third amended complaint, and it, boy, I don't want to concede anything. It's difficult to say that it was not an abuse of discretion. We don't have to say that if we were to say your opposing counsel was very candid about the impact of violence. That's an intervening authority. And that was part of the judge's decision was that he was not speaking as a private citizen. And if I understand Judge Gleeson's question, it goes more to the specificity of the allegations. And that's why I'm arguing that the allegations as they stand right now are sufficient under Ng v. Cooley to allege a First Amendment retaliation claim. Yes, it could be pled more specifically. Ng v. Cooley, I don't know if that argument helps you, because Ng was in existence when the district court said you hadn't pled enough. Your best hope is that we remand it for the district court to reconsider in light of the new authority, because if, I mean, I can't say that it was abuse of discretion under existing authority for the district court to say that, you know, you haven't met your burden. Well, when I refer to Ng v. Cooley, I'm just referring to the five standards for a First Amendment retaliation claim and not, for instance, Iqbal, the plausibility or the level of specificity of the allegations. But under Ng, Ellens is certainly helpful to our case. So Ellens, and didn't the Dahlia-Ambang decision come out after the district court ruled? Both of those cases did, yes. And both of those cases, because it seems that the judge held as a matter of law, if you're speaking as a union official, you only have that job because you work for the city. But two judges said that. Two judges said that. No, I'm talking about the district court. I'm sorry, no, I know that you concurred, Judge Rawlinson, in that decision. I don't think any of these decisions should be made as a matter of law. I think the Supreme Court said they're fact-driven. No, what I'm saying is that the district court seemed to hold or view as a matter of law that O'Connor spoke as a public employee, because even though he was a union official because he worked for the city, he would have no other business being in the union. That would no longer be good law. Right, under Ellens. Well, I don't have any time left. Well, I hope I have a chance to do a rebuttal. We'll see what happens. Thank you. Good morning. May it please the court, my name is Laura Colty with Lieber Cassidy Whitmore, attorneys for appellees, the city of Desert Hot Springs, and all of the individual defendants. It appears the court has honed in on the key issue in this case, which is this is a case about pleadings. And appellant had the opportunity to plead his case four separate times over the period of three years. And each time, three of the times was specifically instructed to give more information on the form, on the content of his speech. And each time he failed to do so. And only then was his case dismissed. So we have some information about what he might plead, but the question is, why didn't he plead it before? Moreover, he is now retired. He had his day in court for over a year to try to plead. Can I ask you, the fact of his medical retirement, does that move this case? Or does he, as his appellate counsel suggests, would, if he were to prevail in this case, would that affect somehow the pension benefits that he's getting? Well, I think it certainly would impact the potential damages. I can't say that, you know, it does relate to conduct which occurred prior to his retirement. I think in terms of, to the extent this court is at all tempted to have the district court reconsider this case in light of the new authority in Ellens, in Dahlia, it would seem past its point that this person is no longer working in the city, is no longer at risk of suffering any potential harm. And so it wouldn't seem that there's a need to go back and try to reach out to him. But did he suffer, if his allegations did amount to speech as a private citizen on a matter of public concern, did he suffer past harm? I think it's arguable. I don't think I can stand here and argue that it completely moots its case. It significantly would reduce the potential of claim damages. I don't think there's a need to go back, but I can't say that it absolutely moots his case. Do you disagree with opposing counsel's characterization of the district court's holding that because he spoke as a union official, he was per se speaking as a public employee? Do you agree with that? I don't agree with that. And I think what the district court said repeatedly is we don't have enough information to make a definitive determination on whether O'Connor was speaking on a matter of public concern or as a private citizen. And so that was the primary basis for the district court's holding. I don't think the district court went so far as to say as a matter of law that it was not speech as a matter of public concern or as a private citizen, but the court said we need more information. And I think that's consistent with the concurring opinion in the Ellens case to say it's not necessarily going to be automatic that speech as part of the union is considered speech as a private citizen, but that we have to look at the context of the particular situation to see whether or not O'Connor was speaking on behalf of himself, whether or not he had the concurrence of the entire union, whether it was on behalf of a couple members of the union. I think the district court and this court needed more information in order to really assess the legal standard. In terms of some of the allegations that opposing counsel indicated he would include if he had the opportunity to go back and include these allegations, you know, he referenced that perhaps O'Connor had gone to the chief with a complaint, but I think it's important to note that in the Third Amendment complaint and all of the preceding complaints, there was zero reference to any complaints. There was zero reference to any conversations with the chief of police. The closest that O'Connor got was in paragraph 29, and this is referenced in Apelli's excerpts, page 85, that he brought, quote, association concerns to the city manager's attention. And so there is no reference to any discussions, let alone complaints, anywhere in the complaint related to the chief of police. And I think the district court specifically addressed this term of association concerns to ask O'Connor to at least give a single example, perhaps not an exhaustive list, but a single example of what it is he was talking about, because I don't think the mere fact that something is described as an association concern means it necessarily rises to the level of a public concern. And I don't think that rises anywhere near the level of a matter of public concern. Similarly, counsel talked about his actions on behalf of the association, and I think even in terms of his potential pleadings, he's talking about speech or conduct during association meetings themselves. Internal association meetings where department management is not involved. He's also talking about negotiations across the table, and I think it's a potentially dangerous direction to go in to allege that any negotiations back and forth across the table are automatically going to rise to that level of public concern. And I think that's the problem, because the internal personnel grievances were not talking about speech. But the problem is that we don't really know. That's the problem. I agree. We don't know whether because the allegations were never specific enough to let Judge Wilson know. I agree, and I don't think the fact that we now have the benefit. Let me ask you, what if he had alleged that he spoke on a matter of public concern and it was that level of generality? Would you think that was sufficient? I think he did include those types of summary, conclusory allegations. Public concern? And I can point the Court to a few of them. But I don't think that satisfies the Iqbal standard, and I think that's conclusory and self-serving pleading. So the paragraphs, you know, paragraph 16, this is Apelli's excerpts, page 83. Plaintiff has been and remains active in promoting the rights and benefits of other association members, and you saw counsel refer to the POBR and the MMBA. So these broad discussion of the rights of officers. Similarly, at page 84 of Apelli's excerpts, paragraph 19, plaintiff promoted the exercise of rights of other officers under the POBR and the First Amendment. Looking at paragraph 21 on that same page, since that time, plaintiff has actively taken part in numerous speech, labor, and political activities. What did you do? What did you say? What were the labor activities? Who did you talk to? We don't have any of this information. The Court doesn't. So I'm just wondering what level of specificity is required in this kind of context. Well, I think more than we have. I obviously can't come up with an absolute list of if he said this, it would have been sufficient. But I think what is clear is that what we have before us was not sufficient and that appellant had significant opportunity to try to come up with more information. In just today, standing here, the fact that we could have had more information about a complaint purportedly made to the chief of police, whether or not the issue of counsel also brought up the statement purportedly by O'Connor that we are not going to vote on this. I don't think that's enough to satisfy the public concern standard, even as a matter of pleading, because there we're talking about a statement within an internal union meeting saying we are not going to vote on this. And the fact of a simple procedural act of voting yes or no on an MOU I think isn't sufficient to meet that public concern test. So I don't know how much is enough, but I would argue that what we have in front of us is simply not sufficient. It wasn't sufficient for the district court to address whether or not it met the standard for protected speech. So there was some discussion with your colleague about remanding to reconsider the dismissal in light of the new authority from the circuit. And what are your thoughts on that? My thoughts are that appellant already had his day in court. This is a matter of four different opportunities to plead his case from the period of April 2011 through March 2012. He has since medically retired. And the fact is that the court did not misapply the legal standard because it never got to the point of specifically making findings on public concern or private citizens. So the fact that now appellant would have more guidance to try to plead his allegations, I don't think that's the appropriate inquiry. I don't think we have any incorrect legal rulings in light of the new law under Ellens and under Dahlia. And I think appellant already had his day in court, and it would be futile and a waste of judicial resources to go back and do this all again. Just to draw the court's attention, again, focusing on the current state of the complaint, the facts which are in front of the court based on the third amended complaint. Just finishing going through, looking at Appelli's excerpts of the record, page 85, the court asked about if appellant tried to plead public concern included at paragraph 26. You see plaintiff led the association in contract negotiations, matters which have traditionally been of interest to the public. But I think the key, the best they get to in terms of trying to plead some specificity are at paragraphs 28 and 29 of the third amended complaint. And here note that it says the association received a vote of no confidence. That doesn't have anything in terms of speech by appellant. It doesn't say what happened, who made the vote, who participated. And specifically as to O'Connor, there is nothing specific in terms of him leading a vote, him doing anything with that vote of no confidence, but the simple fact that they purportedly received a vote of no confidence. And then paragraph 29, I refer to the fact, you know, they tried to plead that there were a litany of complaints regarding department management. So after being told to give more information, why is it that they didn't plead a single one of those complaints against department management? If there was a litany of complaints, why weren't they pled in response to the court's instruction that there needs to be more information in order to assess whether it meets the legal standard? If the court does not have any other questions, I mean, I think this case is a case about pleading. I don't think the district court abused its discretion. I think appellant had his day in court. And I would request that the court affirm the district court's decision dismissing the case. Thank you very much. You can have a minute for rebuttal. It's a good thing you have these books here. As far as the level of specificity, Federal Rules of Procedure Rule 9 talks about a heightened standard of pleading for certain allegations of fraud. This is not one of them. So I don't think that this needs to rise to that level. Those rules have been interpreted by the Supreme Court in Columbia and Iqbal to require specificity in pleading. More specificity. A plausible claim. Well, nobody has made the argument that, or the city hasn't made the argument that the claims, the allegations are not plausible. It's certainly plausible that as an outspoken... We don't know what the allegations are, what the specifics are. Well, I've told you what, if he was given a chance to amend, what they could be. As the complaint exists. As the complaint exists, we have clear allegations that are certainly plausible that he was told, you need to pipe down. Your outspokenness is causing you a problem. You weren't promoted to sergeant, and when asked, when the chief was asked about it, he said, I have my reasons. And you can put together the pieces of the puzzle. The district judge at page 3 of appellant's excerpts focuses on two problems. The plaintiff's third amendment complaint fails to allege sufficient facts to show that he spoke on a matter of public concern and that he spoke as a private citizen rather than a public employee. Going to the second one first, in allegations 25 through 29, he talks about I was not paid to be in the union. I did this on my own time. I did not hold myself out as a representative. This is not part of my official duties. I don't know what else he has to plead as far as being a private citizen for purposes of union activities other than that. So I think with the decision in Ellens, that that would be a basis to remand it to the district court on that issue. Judge Rawlinson, you asked me about pleading the public concern prong of Eng. And, again, I'm not really sure how you plead that other than to say this is a matter of public concern. Because my understanding under, I think it's Robinson versus York, that question is a matter of law. And it's for the district court to decide whether the particular speech or the issues that are the subject of the speech are a matter of public concern. So he can plead it all he wants. That's not going to help. The Supreme Court has said that it's a fact-intensive inquiry. Well, it's a mixed question of law and fact. But the public concern part of Eng versus Cooley is a question of law. And the duties, I think, is the mixed question of law and fact. Okay. So are you arguing that the district court abuses discretion in denying further opportunities to a man? Particularly in light of Ellens. Because the allegations are there in the early allegations of the complaint, 25 through 29, I believe. As to whether he was speaking as a private citizen or a public employee. What allegations are there about public concern, though? The subject matter, the MOU, that they would not ‑‑ I mean, what you have in paragraphs 38 and 39. I understand your argument. So the chief's crony is trying to get this MOU through. And the association leadership is saying, wait a second. I mean, that borders on corruption. And I think the public would be concerned about that. As far as what's actually in there. The vote of no confidence as to Commander Singer. Yes, the allegation is ‑‑ and I admit it's a strange allegation. The association received a vote of no confidence. I suppose the association voted to not have confidence. Might be a little better. But I can allege under Rule 11, after discussions with my client, that he led this vote. That he said, let's do this. We've got a problem with Commander Singer. And even though those things happen at an association meeting, it's the fact that the information works its way up to the brass, and then there's retaliation. It's not ‑‑ it can't be a vote of no confidence because they're not getting sufficient raises. It has to be a vote of no confidence because of corruption or mismanagement or threats to the public safety or, you know, beating up arrestees or something like that. Okay. I understand that. But Commander Singer, the one that the association voted to not have confidence in, was a commander, not the chief. And frankly, I don't know exactly what the basis of the vote of no confidence was for. Okay. Well, I think you have a minute. You've had four. So I think we have enough to consider this on. So thank you very much.
judges: Gleason, Wardlaw, Rawlinson